DECISION.
{¶ 1} This appeal challenges the damages awarded by the trial court to the plaintiffs-appellees, Michael and Linda Peterman, after the defendant-appellant, Paro[1] Dimoski, reneged on a contract to purchase their house. Dimoski notified the Petermans of his intended breach of the purchase contract approximately one week before the closing date, which was only two days before the Petermans were scheduled to close on their new home, which had been in construction for a period of nine months. As a result of the breach, the Petermans delayed closing on their new home and remained in possession of their old home for approximately two months, at which time they sold it for $2,000 less than the price in the Dimoski contract ($206,000 rather than $208,000), and at a higher rate of commission (6% rather than 4%) with a new broker.
{¶ 2} In addition to the loss of $2,000 on the purchase price, the trial court awarded the Petermans additional damages, including the expenses they incurred by the two-month delay in finding a new purchaser. The trial court awarded the Petermans compensation for (1) mortgage payments on the old home before it was sold ($2,555.26); (2) the cost of a bridge loan to maintain financing for their new home ($1,183.45); (3) the difference in broker's commissions ($4,040); (4) utility expenses incurred at the old home until it was sold ($211.76); (5) additional closing costs ($300); additional real estate taxes on the old home until it was sold ($481.81); (6) additional homeowners' association dues until the old home was sold ($75); and (7) the purchase of an extended home warranty ($375). The total amount of the damage award was $11,222.28.
{¶ 3} On appeal, Dimoski argues that under Ohio law the only damages to which the Petermans were entitled was the difference between the contract price and the fair market value of their old home at the time of his breach. Alternatively, he argues that, even if the Petermans were entitled to additional damages, the trial court erred in awarding damages for expenses that they would have necessarily incurred regardless of the breach, or for which they were later compensated by the sale of their old home.
{¶ 4} This court has previously held that "the proper measure of damages for a buyer's breach of a contract for the sale of real property is the difference between the original contract price and the fair market value of the property at the time of the breach." E.K. Investments v.Kleckner (Nov. 27, 1991), 1st Dist. Nos. C-900364, C-900427, and C-900461. Further, we have held that the party seeking to recover damages must not only present evidence of the resale price, but must also present sufficient evidence that the resale price was the true indicator of the fair market value at the time of the breach. Loft v. Sibcy ClineRealtors (Dec. 13, 1989), 1st Dist. No. C-880446. Generally, it is error for the trial court merely to award the difference between the original contract price and the resale price upon the assumption that the resale price constitutes the fair market value of the home. Id.
{¶ 5} Although the Petermans presented evidence of the resale price, they did not present any evidence to show that the resale price was the "true indicator" of the fair market value at the time of the breach. Nonetheless, counsel for Dimoski stated during closing argument that his client did not dispute that "the difference in the sale price is an element of damage," and then identified that amount as $2,000. We interpret this statement as being tantamount to a stipulation that the resale price of $206,000 was the "true indicator" of the fair market value of the home at the time of the breach.
{¶ 6} Further, counsel for Dimoski — again during closing argument stated that his client did not contest that the price of the extended home warranty was "an appropriate element of damages." We uphold, therefore, these elements of the damage award. We proceed, then, to examine each of the remaining elements.
{¶ 7} Michael Peterman testified that following Dimoski's breach he received word from his original real estate broker that the broker would not be able to represent the property further because the broker was leaving on an extended vacation. The original broker had been operating on a commission of 4%. Peterman testified that he then asked around and was given the name of the city's most successful broker, whom he retained at a negotiated commission of 6%. (According to Peterman, the new broker's usual rate of commission was 7%.) Peterman testified that he did not attempt to retain any other broker. There was no testimony or evidence regarding the standard rate of commission or the availability of other brokers charging the same 4% commission as the original broker. The difference in the rate of commission resulted in an additional loss to the Petermans of $4,040, which the trial court included in the damage award.
{¶ 8} Dimoski argues that the difference in commissions was not compensable, and that, even if it were, the Petermans were required to mitigate their damages by retaining a new broker who charged only the same 4% commission charged by their original broker. Respecting the first argument, we have previously held that, in an action for breach of a real estate contract, the aggrieved seller is not limited to only the difference between the contract price and fair market value. Callahan v.Richardson (Apr. 4, 1979), 1st Dist. No. C-780119. Rather, the aggrieved seller may recover special damages to the extent that the parties could have reasonably anticipated them. Id., citing 3 McDermott, Ohio Real Property Law and Practice (3 Ed. 1966), Section 28-34(A), 415; Dobbs, Remedies (1973), Section 12.11, 853; 54 Ohio Jurisprudence 2d (1962) 733, Vendor and Purchaser, Section 181; and Roegge v. Wortheimer (1923), 1 Ohio Law Abs. 834. In Callahan, we specifically held that the seller's liability for a broker's commission on the sale of a house is a proper item of damages. As we observed, "The expense of paying a real estate broker's commission for the subsequent sale could reasonably have been anticipated by both parties as a result of the breach. Sellers, being under a duty to mitigate damages, had an obligation to consummate a new sale as expeditiously as possible. The employment of a broker would be the normal way to accomplish this. A subsequently incurred broker's commission is recoverable as an item of special damages." Callahan, supra, citing Ashurst v. Rosser (1963), 275 Ala. 163, 153 So.2d 240.
{¶ 9} Although Dimoski argues that the Petermans were required to avoid additional damages by seeking to enlist a replacement broker with the same low 4% commission rate as the original broker, we do not agree that they were under a strict duty to do so. Obviously, the Petermans were in a hurry to sell their home, as most sellers would be, having lost a sale only a few days before closing. Certainly Dimoski could have reasonably anticipated that the Petermans would move quickly and would seek a broker with a reputation for results. Although the second broker's commission was more than the first, there is no evidence that the commission rate of 6% was extraordinary or exploitative. Obviously, Dimoski would not have been liable for the difference if the Petermans had retained a broker with an exorbitant rate of commission, but we hold that the difference here was within the realm of anticipated special damages.
{¶ 10} Similarly, we hold that the additional closing costs incurred in selling the property were a recoverable item of damage. Obviously, when a buyer breaches, he or she can anticipate that the vendor may incur additional closing costs when selling the property. SeeJensen v. Dalton (1970), 9 Cal.App.3d 654, 88 Cal.Reptr. 426. Dimoski argues that the Petermans failed to prove that they incurred such costs and points to the absence of language in the two purchase contracts requiring the Petermans to pay closing costs. Having examined the contracts, however, we find nothing in their language that would necessarily render false Peterman's testimony that he paid closing costs involved in the sale.
{¶ 11} Turning to the cost of utilities, real estate taxes, and homeowners' association dues for the period until the home was sold, we consider such expenses generally incidental to the Petermans' continued ownership and management of the property. Accordingly, we do not consider such expenses normally recoverable as a proper element of additional special damages. See Roesch v. Bray (1988), 46 Ohio App.3d 49,545 N.E.2d 1301; Kauder v. Thompson (May 9, 1985), 2d Dist. No. 9265. To allow the recovery of such expenses would be analogous to allowing a car owner to recoup from a defaulting buyer the costs of maintenance, gasoline, and automobile club membership dues until the vehicle is sold. Such a result, in our view, goes far beyond the reach of recoverable contract damages.
{¶ 12} The question arises, however, whether the Petermans were entitled to an apportioned share of such expenses for the 23-day period during which they were in possession of both homes. Specifically, the Peterman's closed on their new home on October 31, 2000, moved into the new home on the next day, and did not sell their old home until November 22, 2000. During that 23-day period, the Petermans were paying the cost of utilities on both homes, real estate taxes on both homes, and homeowners' association fees on their old home. The Petermans argue that these duplicative and/or unnecessary expenses would not have occurred had Dimoski not breached, and therefore that he could have been held responsible for them. Dimoski argues, on the other hand, that the decision to close and move into the new home before selling the old house was completely discretionary with the Petermans, and that it was their decision, and not his earlier breach, that caused the duplicative and unnecessary expenses.
{¶ 13} Although equitable considerations may lie in favor of the Petermans, in our view contract law does not. As we have noted, the basic measure of damages for a breached real estate contract remains a market-value differential — i.e., the difference in contract price and fair market value. The primary purpose of the damage award is to restore the vendor to his or her pre-sale position — in other words, to compensate the vendor for the loss of the bargain on the sale. Although the vendor may be entitled to appropriate special damages that follow naturally from the breach, these damages, being contract damages, are not as broad as those available in tort, which applies a simple butfor test. Ever since the decision in Hadley v. Baxendale (1845), 156 Eng. Rep. 145, consequential or special damages in contract have been limited to those that are certain, foreseeable, and within the contemplation of the parties at the time the contract was entered into. See Calimari, Contracts (1976), Sections 206-209. In Callahan, we held that special damages would include the cost of maintaining the home until sold if the vendor had already moved out of the home and into a leased apartment at the time of the breach. But where, as here, the vendor maintains occupancy following the breach and then decides to move into a new home before the old home is sold, we believe that the economic risk of that decision lies with the owner — at least insofar as the law of contract is concerned. We acknowledge, in this regard, that the Petermans were planning at the time of the Dimoski breach to close on their new home only a few days later. They were obviously in a hurry to move. But their hurry was not the result of Dimoski's breach, but of the fact that the new home they had been building for nine months was ready, and they needed either to close on it or to face losing their dream house. To adopt a rule that would hold Dimoski liable for the maintenance of the old home until it was sold would mean that Dimoski could have been potentially liable for months of utility bills, real estate taxes, and other costs of upkeep — an amount greatly exceeding the market-value differential and more in the nature of tort or insurance damages than contract damages. As noted by the Second Appellate District in Roesch, although certain expenses in maintaining the property until future sale might be foreseeable, the unknown duration and extent of such expenses render them simply too speculative for the more rigorous damage equation required by the law of contracts. Roesch, supra, at 51,545 N.E.2d 1301.
{¶ 14} As regards the mortgage payments, the same logic applies. We also find persuasive Dimoski's argument that to allow recovery for payments on the principal would result in a double recovery for the Petermans, since any reduction of the principal would have increased their share of the sale proceeds by an equal, restorative amount.
{¶ 15} Finally, Dimoski argues that he should not have been held liable for the cost of the bridge loan that the Petermans felt compelled to obtain to provide financing for their new home. Michael Peterman testified that, faced with the sudden loss of the proceeds from the Dimoski sale, he was afraid that the builder of his new home would put it on the market — something he was determined not to have happen. To avoid this, he procured a bridge loan that enabled him to finance his new home. The trial court awarded him the finance costs of obtaining the loan ($1,183.45). We consider this expense akin to the closing costs of the second sale, in other words, a direct economic consequence of the breach. Accordingly, we find no error in the trial court's award of this item of damage, or in its calculation.
{¶ 16} Dimoski's five assignments of error are overruled except to the extent that they pertain to the trial court's award of mortgage payments ($2,555.26), utility bills ($211.76), real estate taxes ($481.81), and homeowners' association dues ($75.11). This amounts to a reduction in the award of $3,323.94, leaving a total judgment of $7,898.34. The judgment of the trial is accordingly modified to reflect this amount and it is affirmed as modified.
Judgment affirmed as modified.
PAINTER, P.J., GORMAN and SUNDERMANN, JJ.
[1] Although Dimoski's first name is spelled with an "a" on the complaint and in the notice of appeal, the name is spelled with an "e" in his appellate brief. We have retained the spelling as it appears in the notice of appeal.